UNITED STATES of America, Petitioner,

v.

Jeffrey SHIELDS, Respondent.

United States of America, Petitioner,

v.

Joel Wetmore, Respondent.

United States of America, Petitioner,

v.

Charles Peavy, Respondent.

Civil Action Nos. 07–12056–PBS, 07–12058–PBS, 07–12059–PBS.

United States District Court, D. Massachusetts.

Nov. 7, 2007.

318

Mark T. Quinlivan, Rayford A. Farquhar, United States Attorney's Office, Boston, MA, for Petitioner.

John G. Swomley, Swomley & Associates, Page Kelley, Judith H. Mizner, William W. Fick, Federal Defenders, Boston, MA, for Respondents.

## MEMORANDUM AND ORDER

PATTI B. SARIS, District Judge.

### I. *INTRODUCTION*

In July 2006, Congress enacted the Adam Walsh Child Protection and Safety Act of 2006, Pub.L. No 109–248, 120 Stat. 587 (2006), to combat sexual violence and to "protect children from sexual exploitation and violent crime." Among other things, the Adam Walsh Act creates national child abuse and sex offender registries, increases federal criminal penalties for violent and sexually violent crimes against children, and provides grants to states to establish, enhance, and operate civil commitment programs for sexually dangerous persons. Section 302 of the Adam Walsh Act, entitled the Jimmy Ryce Civil Commitment Program (hereinafter "the Act" or "Section 4248"),[1] authorizes and establishes procedures for the potentially lifetime commitment of a "sexually dangerous person." *See* 18 U.S.C. § 4248(a).

Charles Peavy, Jeffrey Shields, and Joel Wetmore, the respondents,[2] are three individuals currently in the custody of the Bureau of Prisons ("BOP") pursuant to a government certification that each is a "sexually dangerous person" under the Act. Each respondent was certified to be a "sexually dangerous person" one day before he was scheduled to be released from federal custody. As a result of the certification, each respondent's release was stayed. *See* 18 U.S.C. § 4248(a).

At the time of his certification, Mr. Peavy was serving a six month term for assault. Mr. Shields was serving a fifty-seven month federal term of imprisonment

---

1. The relevant provisions of the Jimmy Ryce Civil Commitment Program are codified at Title 18, Sections 4247 and 4248.

2. For purposes of this Order, Jeffrey Shields, Joel Wetmore, and Charles Peavy will be collectively referred to as "respondents."

for a child pornography offense. Mr. Wetmore was serving an eighty-seven month term for a child pornography offense.

Pursuant to 18 U.S.C. § 4248(a), the government has requested hearings to determine whether each respondent is a "sexually dangerous person" subject to "civil" commitment to the custody of the Attorney General. On May 16, 2007, respondents filed a motion to dismiss the commitment proceedings, asserting that the Act is facially unconstitutional. Respondents assert multiple facial challenges to the civil commitment regime, arguing that it:

1) exceeds congressional authority under Article I, Section 8 and is inconsistent with the Tenth Amendment;

2) denies respondents equal protection of the laws;

3) subjects respondents to criminal proceedings without required constitutional protections;

4) denies respondents due process of law by failing to provide necessary procedural protections;

5) denies respondents due process of law by failing to define key terms adequately; and

6) denies respondents due process of law by requiring expert testimony that is insufficiently reliable to meet the evidentiary standard required for commitment.

The Act is the first federal statute to provide for the commitment of sexually dangerous persons. Many states have statutes allowing for the civil commitment of sexually violent predators. The Supreme Court has rejected a constitutional challenge to one such statute. *See Kansas v. Crane*, 534 U.S. 407, 409, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002); *Kansas v. Hendricks*, 521 U.S. 346, 350, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). To date, three courts have reviewed constitutional challenges to Section 4248. *See United States v. Comstock*, 507 F.Supp.2d 522, 526, 2007 WL 2588815, at *1 (E.D.N.C. Sept.7, 2007) (holding the Act unconstitutional because it is "not a necessary and proper exercise of Congressional authority and ... [because] the use of a clear and convincing burden of proof violates the ... due process rights of those subject to commitment under the statute"); *United States v. Carta*, 503 F.Supp.2d 405, 407 (D.Mass.2007) (Tauro, J.) (upholding the Act as to all facial challenges but denying respondents' motions to dismiss without prejudice to the court's consideration of an as-applied challenge); *United States v. Harnden*, No. 06–6960 (C.D.Cal. Dec. 27, 2006) (rejecting respondent's facial and as-applied challenges but finding that Section 4248 "must be read to afford persons certified under it an opportunity for a probable cause hearing within a reasonable period of time").

After a hearing on September 17, 2007, the Court **DENIES** the motion to dismiss. Among other things, it holds: (1) that the Act was a necessary and proper exercise of congressional power; (2) that the clear and convincing burden of proof with respect to the required finding that a person "has engaged or attempted to engage in sexually violent conduct or child molestation," 18 U.S.C. § 4247(a)(5), violates the Due Process Clause; and (3) that Section 4248 must provide persons certified under it an opportunity for a probable cause hearing before a neutral decisionmaker within a reasonable period of time following any detention beyond their scheduled date of release.

## II. *STATUTORY FRAMEWORK*

### A. *Sexually Dangerous Person*

A "sexually dangerous person" is defined under the Act as one who "has engaged or attempted to engage in sexually

violent conduct or child molestation *and* who is sexually dangerous to others." 18 U.S.C. § 4247(a)(5) (emphasis added). A *person is "sexually dangerous to others"* if the person "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). The statute does not define the terms "sexually violent conduct" or "child molestation."

## B. Statutory Procedures

The Act authorizes the Attorney General, or any person authorized by the Attorney General or the BOP, to certify as "sexually dangerous" any person within any of three categories: [3] 1) those who are in the custody of the Bureau of Prisons; 2) those who have been committed to the custody of the Attorney General pursuant to 18 U.S.C. § 4241(d) based on incompetence to stand trial; and 3) those against whom all charges have been dismissed solely for reasons relating to their mental condition. 18 U.S.C. § 4248(a). Once such certification is filed with the clerk of the district court, the release of the certified individual is stayed pending the completion of a "hearing" to determine whether the certified person is a "sexually dangerous person." *Id.* Thus, if the government has certified a prisoner as a "sexually dangerous person," he will be held in custody even after his sentence has expired. The statute does not provide for any type of preliminary hearing or review by a neutral decisionmaker before the stay of release goes into effect.

Between certification and the court hearing, the court may order a psychiatric or psychological examination of the certified individual and require "that a psychiatric or psychological report be filed with the court." 18 U.S.C. § 4248(b). Up to seventy-five days are allotted for completion of the evaluation once ordered by the court. 18 U.S.C. § 4247(b).

At the hearing, the certified person shall be represented by counsel (including appointed counsel under 18 U.S.C. § 3006(A)) and "shall be afforded an opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine" any testifying witnesses. 18 U.S.C. § 4247(d). If, after the hearing, the court finds, by clear and convincing evidence, that the certified individual is a sexually dangerous person, it must commit the individual to the custody of the Attorney General. 18 U.S.C. § 4248(d). The Attorney General must then "make all reasonable efforts" to cause the State in which the individual is domiciled or was tried to assume responsibility of his "custody, care, and treatment." *Id.* If no State will assume such responsibility,

---

**3.** The BOP has proposed regulations to interpret the terms "sexually violent conduct" and "child molestation." *See* Civil Commitment of a Sexually Dangerous Person, 72 Fed.Reg. 43205-01 (proposed Aug. 3, 2007) (to be codified at 28 C.F.R. pt. 549). In addition to providing specific definitions for each term, the proposed regulations seek to outline the "two-step analysis" by which the BOP will determine: 1) whether an individual has engaged or attempted to engage in sexually violent conduct or child molestation, and 2) whether that individual would be sexually dangerous to others if released. *Id.* § 549.71.

Under the proposed regulations, the BOP, in its first step of the analysis, can consider all conduct of the person for which information is available, regardless of its source. The proposed regulations do "not require that the person be convicted of or presently charged with the conduct in question." *Id.* § 549.72. Likewise, in the second step of the analysis, "the Bureau or Bureau-contracted mental health professionals may use all available information about conduct and medical condition to determine a person's sexual dangerousness to others." *Id.* § 549.74.

the Attorney General must place the individual for treatment in a suitable facility. *Id.*

The individual will remain committed until a State assumes responsibility for him, his "condition is such that he is no longer sexually dangerous to others," or he will not be so "if released under a prescribed regimen of medical, psychiatric, or psychological care or treatment." *Id.* A committed individual, or his counsel or legal guardian, has the right to request a review of his commitment by the court. 18 U.S.C. § 4247(h). There is no limit on the number of motions for review that a committed individual may pursue, but he may only file such a motion after 180 days have passed since the last court determination that he should remain committed. *Id.*

## III. *DISCUSSION*

### A. *Congressional Authority to Enact Section 4248*

█ Respondents' first challenge is that Section 4248 is facially unconstitutional because it exceeds congressional power under Article I, Section 8 of the Constitution, which provides:

> The Congress shall have power to . . . regulate commerce with foreign nations, and among the several states, and with the Indian tribes . . . [a]nd . . . [t]o make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof.

U.S. Const. art. I, § 8. Respondents assert that neither the Commerce Clause nor the Necessary and Proper Clause authorizes the Act. As the language of Article I, Section 8 makes clear, to be valid under the Necessary and Proper Clause, an Act of Congress must be 1) linked to the exercise of an enumerated or incidental power vested in the government by the Constitution; 2) necessary; and 3) proper. *See Comstock*, 2007 WL 2588815, at *5. They also contend that the Act is inconsistent with the Tenth Amendment because it upsets the federalist balance of government.

### 1. *The Underlying Source of Congressional Authority*

Congress did not explicitly identify the source of federal authority on which it relied in enacting the civil commitment provision of the Adam Walsh Act. The government asserts that the federal government's power to prosecute federal offenses provides the necessary authority to support Section 4248. In *Greenwood v. United States*, 350 U.S. 366, 76 S.Ct. 410, 100 L.Ed. 412 (1956), the Supreme Court upheld Congress's power to civilly commit an individual deemed incompetent to stand trial as "plainly within congressional power under the Necessary and Proper Clause" because the "federal authority to prosecute" that individual had not yet been exhausted. *Id.* at 375. *Greenwood* establishes congressional authority for Section 4248 as it applies to the second category of individuals potentially subject to civil commitment under the Act, which includes those who have "been committed to the custody of the Attorney General pursuant to § 4241(d)" based on incompetence to stand trial. 18 U.S.C. § 4248; *see also* 18 U.S.C. § 4241 ("Determination of mental competency to stand trial to undergo post-release proceedings."). However, *Greenwood* is not so clearly dispositive of the issue of congressional power with respect to the other two categories under the Act because those categories involve "persons as to whom the power to prosecute is, in fact, exhausted." *Comstock*, 2007 WL 2588815, at *7–8.

The government contends that the federal government's power to prevent the

commission of federal sex crimes provides Congress with the authority to enact Section 4248 in its entirety. *Cf. United States v. Perry,* 788 F.2d 100, 111 (3d Cir.1986) (upholding the pretrial detention of certain criminal defendants "[b]ecause Congress has the power to proscribe [federal offenses] ...., [and] it [therefore] has the auxiliary authority, under the necessary and proper clause, to resort to civil commitment to prevent their occurrence"). The two district courts that have confronted the Necessary and Proper Clause challenge to the Act have reached differing conclusions. *Compare Comstock,* 2007 WL 2588815, at *12 (holding that Congress did not have authority under the Necessary and Proper Clause to enact Section 4248 and finding the government's reliance on *Perry* "unpersuasive"), *with Carta,* 503 F.Supp.2d at 407 n. 5 (holding that Congress has authority to enact Section 4248 and noting, "Though § 4248 is not linked to specific crimes, it still would have the goal and effect of preventing federal crimes.")

While the issue is close, I conclude that Congress has the authority to enact Section 4248 pursuant to the federal government's power under the Commerce Clause to prevent the commission of federal sex crimes. *See Perry,* 788 F.2d at 111. As Justice Stevens stated in his dissent in *United States v. Salerno,* "It is indeed difficult to accept the proposition that the [Federal] Government is without power to detain a person when it is a virtual certainty that he or she would otherwise kill a group of innocent people in the immediate future." 481 U.S. 739, 768, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (Stevens, J., dissenting). Similarly, it is difficult to accept the proposition that the federal government does not have the authority to prevent the release into the community of a sexually dangerous person in its custody who is likely to commit future federal and/or state sex crimes involving harm to another person, especially a child.

## 2. *Necessary and Proper*

The next issue is whether Section 4248 is a necessary and proper exercise of that power. The Supreme Court "long ago rejected the view that the Necessary and Proper Clause demands that an Act of Congress be *absolutely* necessary to the exercise of an enumerated power." *Jinks v. Richland County, S.C.,* 538 U.S. 456, 462, 123 S.Ct. 1667, 155 L.Ed.2d 631 (2003) (internal quotation marks omitted). The Act, however, must be "plainly adapted" to a "legitimate end," use "appropriate" means, and be "consist[ent] with the letter and spirit of the constitution." *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819).

Respondents contend that the Act is neither "plainly adapted" nor an appropriate means of preventing the commission of federal crimes. However, the test is not a particularly demanding one: "the Necessary and Proper Clause enables Congress to enact laws, subject to other constitutional constraints, 'that bear a rational connection to any of its enumerated powers.'" *United States v. Plotts,* 347 F.3d 873, 878 (10th Cir.2003) (quoting *United States v. Edgar,* 304 F.3d 1320, 1326 (11th Cir.2002)). The civil commitment of those already in federal custody who, as a result of a mental condition, will likely commit sexually violent crimes does have a rational relation to congressional authority to proscribe and prevent such conduct.

The inquiry, however, is not complete. The Act overlaps with two different areas traditionally governed by the states: "the prohibition of sexually violent criminal conduct and the commitment of and care for mentally ill individuals." *Comstock,* 2007 WL 2588815, at *15. As such, re-

spondents also insist that the Act is not "consistent with the letter and spirit of the Constitution" because it violates other constitutional guarantees and upsets the federalist balance of government established by the Tenth Amendment. *M'Culloch,* 17 U.S. at 421, 4 Wheat. 316. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." U.S. Const. amend. X. As a constitutional provision, the Tenth Amendment limits the necessary and proper power of Congress and is therefore pertinent to an inquiry into whether a particular statute is a proper exercise of congressional power. *See Comstock,* 2007 WL 2588815, at *15 ("The interpretation and application of the Necessary and Proper Clause must accord with the letter and spirit of the Tenth Amendment and the historical reservation of certain defined powers to the States.").

■ As private parties, respondents lack standing to assert an independent constitutional claim alleging that the Act violates the Tenth Amendment. *See Tenn. Elec. Power Co. v. Tenn. Valley Auth.,* 306 U.S. 118, 143–44, 59 S.Ct. 366, 83 L.Ed. 543 (1939); *Medeiros v. Vincent,* 431 F.3d 25, 36 (1st Cir.2005) (rejecting the argument that *Tennessee Valley Authority* is no longer controlling and affirming a district court holding that a commercial fisherman lacked standing to maintain a Tenth Amendment claim), *cert. denied sub. nom., Medeiros v. Sullivan,* —— U.S. ——, 126 S.Ct. 2968, 165 L.Ed.2d 951 (2006).

Prior to the passage of Section 4248, Congress had ventured into the realm of civil commitment via the Insanity Defense Reform Act of 1984, Title II § 6, 18 U.S.C. § 4246 ("Section 4246"). Even then, Congress acted with deference toward the states, as evidenced by both statutory language and legislative history. *See United States v. Clark,* 617 F.2d 180, 184 n. 5 (9th Cir.1980) ("The passage of . . . § 4246 was not intended to be an invasion of the general field of lunacy, which is reserved to the states."); *Comstock,* 2007 WL 2588815, at *18 (discussing the "historical reluctance [of Congress] to overstep the bounds of federal authority in the area of civil commitment legislation" and noting that Section 4246 "is extremely deferential to the states"); S. Rep. 98–225, at 250 (1983), U.S.Code Cong. & Admin.News. 1983, p. 3182, ("[T]he responsibility for the care of insane persons is essentially a function of the states. The committee intends that this section be used only in those rare circumstances where a person has no permanent residence or there are no state authorities willing to accept him for commitment.").

■ Section 4248, respondents contend, departs from this limited approach to federal legislation in the realm of civil commitment. For example, Section 4246 proceedings can only be implemented when "suitable arrangements for State custody and care of the person are not available," 18 U.S.C. § 4246(a), and after a person is committed under the statute, the Attorney General must continue to seek state placement for as long as the individual remains in federal custody, 18 U.S.C. § 4246(d). Under Section 4248, on the other hand, the Attorney General need not contact the states until a person has been found by the court to be a "sexually dangerous person," and if a state refuses to assume responsibility, the Attorney General is not explicitly required to make periodic efforts to secure state placement. *See* 18 U.S.C. § 4248(a), (d). Section 4248, respondents contend, also impacts a much larger group of individuals than does Section 4246, and represents a boundless encroachment into an area properly left to the states. To

qualify for commitment under Section 4246, for example, a federal prisoner must already have been hospitalized in a facility and the director of that facility must certify that person for commitment proceedings. 18 U.S.C. § 4246(a). Section 4248 does not have a comparable hospitalization requirement, and the legislative history indicates that Congress intentionally disposed of the requirement when drafting Section 4248. *See* H.R. Rep. 109–218(I) (2005) ("[P]rior hospitalization ... is an unjustified impediment to seeking civil commitment.").

These differences are not significant enough to render the Act inconsistent "with the letter and spirit of the constitution." *M'Culloch*, 17 U.S. at 421, 4 Wheat. 316. Section 4248 is not a limitless invasion into the traditionally state-dominated realm of civil commitment. Instead, like Section 4246, Section 4248 can be viewed as a "backup" measure, designed to ensure that a dangerous individual does not slip through the cracks simply because he is in federal, as opposed to state, custody. Both Sections 4246 and 4248 explicitly state a preference that a State assume responsibility for the "custody, care, and treatment" of individuals requiring commitment. 18 U.S.C. § 4246(d); 18 U.S.C. § 4248(d). That Section 4248 does not demand that the Attorney General contact a State at the outset of the certification process and does not require the Attorney General to plead repeatedly with a State to assume responsibility is simply not enough to render Section 4248 unconstitutional. Furthermore, a separate provision of the Adam Walsh Act reinforces the notion that Congress has not wholly abandoned its traditional belief that the state, and not the federal government, should be the primary actors in the realm of civil commitment of sexually dangerous persons. *See* 42 U.S.C. § 16971(a) (establishing grants to states "for the purpose of establishing, en-

hancing, or operating effective civil commitment programs for sexually dangerous persons"); H.R. Rep. 109–218 (2005) ("This amendment, in addition to the provision already in the bill that covers Federal sexual violent offenders, would guide States to adopt their own civil confinement laws. Most criminals deemed as sexually violent have broken State rather than Federal laws. This amendment would ensure that we keep many more of them off the street.").

In conclusion, Section 4248 is a necessary and proper exercise of the federal government's power under the Commerce Clause to prevent the commission of federal sex crimes.

## B. *The Evidentiary Standard for Proceedings Under Section 4248*

Before a person can be civilly committed under Section 4248, a court must find that the person is a "sexually dangerous person." 18 U.S.C. § 4248(d). To make this finding, a court, Janus-like, must reach two separate determinations. First, looking backwards, it must determine whether the person has "engaged or attempted to engage in sexually violent conduct or child molestation." 18 U.S.C. § 4247(a)(5). Second, looking forward, it must determine whether the person is "sexually dangerous to others." *Id.; see also* 18 U.S.C. § 4247(a)(6) (defining "sexually dangerous to others"). Each of these findings need only be established "by clear and convincing evidence." 18 U.S.C. § 4248(d).

Respondents assert that the use of the clear and convincing evidentiary standard violates respondents' due process rights. A "beyond a reasonable doubt" burden of proof, they argue, is constitutionally required. The government counters that the

"clear and convincing" standard passes constitutional muster.

The Supreme Court has "consistently upheld" state involuntary commitment statutes against due process challenges when, *inter alia,* "the confinement takes place pursuant to proper procedures and evidentiary standards." *Crane,* 534 U.S. at 409, 122 S.Ct. 867 (quoting *Hendricks,* 521 U.S. at 357, 117 S.Ct. 2072). Although the Court emphasized the importance of procedural protections in any civil commitment scheme, *Crane* and *Hendricks* themselves do not provide specific guidance as to the particular "procedures and evidentiary standards" needed for a civil commitment statute to satisfy the constitutional minimum.

A standard of proof "instruct[s] the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Addington v. Texas,* 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (citing *In re Winship,* 397 U.S. 358, 370, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)). "[A]dopting a standard of proof is more than an empty semantic exercise." *Id.* at 425, 99 S.Ct. 1804 (internal quotation marks omitted). When a case—whether civil or criminal—involves individual rights, the selected standard of proof "reflects the value society places on individual liberty." *Id.* (internal quotation marks omitted). The Supreme Court has instructed that, when adopting a standard of proof for civil commitment proceedings, a court "must assess both the extent of the individual's interest in not being involuntarily confined indefinitely and the state's interest in committing the emotionally disturbed under a particular standard of proof." *Id.* In addition, a court "must be mindful that the function of legal process is to minimize the risk of erroneous deci-

sions." *Id.* (citing *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

### 1. *In re Winship and Addington*

Respondents rely heavily on *In re Winship,* where the Supreme Court held that due process required proof beyond a reasonable doubt for delinquency determinations in New York state juvenile proceedings. *See* 397 U.S. at 368, 90 S.Ct. 1068. Even though the proceedings were civil in nature, the Court "saw no controlling difference in loss of liberty and stigma between a conviction for an adult and a delinquency adjudication for a juvenile." *Addington,* 441 U.S. at 427, 99 S.Ct. 1804 (describing the Court's decision in *Winship* ). The Court "recognized that the basic issue—whether the individual in fact committed a criminal act—was the same in both proceedings," and therefore required a reasonable doubt standard. *Id.* at 427–28, 99 S.Ct. 1804. *Winship* not only establishes that a reasonable doubt standard *can* be constitutionally required in a civil proceeding, but also "supports the proposition that where factual findings of criminal acts must precede the taking of an individual's liberty, those findings *must* be made beyond a reasonable doubt." *Comstock,* 2007 WL 2588815, at *23 (emphasis added).

As in *Winship,* the proceedings here could result in "the complete loss of personal liberty ... through federally-imposed confinement" and the "undeniable stigma" resulting from an adverse finding for the individual. *Id.* at *24. Significantly, both proceedings entail a judicial determination of whether an individual committed or attempted to commit a criminal act.

In response, the government argues that *Addington* is the more analogous Supreme Court precedent. *See* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). *Ad-*

*dington* concerned a Texas statute for civil commitment of certain mentally ill persons, and the Court focused its attention on determining the proper standard for proving whether someone is "mentally ill," "mentally incompetent," or "requires hospitalization." [4] The Court rejected the argument that *Winship* required the use of a "beyond a reasonable doubt" standard in those civil commitment proceedings. *Id.* at 431, 99 S.Ct. 1804. Because the "subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach," the Court expressed concern that a juror or judge "could be forced by the criminal law standard of proof [beyond a reasonable doubt] to reject commitment for many patients" who actually need institutional care. *Id.* at 430, 99 S.Ct. 1804. Concerned about "the lack of certainty and the fallibility of psychiatric diagnosis," *id.* at 429, 99 S.Ct. 1804, the Court held that a "clear and convincing" standard satisfied due process. *Id.* at 433, 99 S.Ct. 1804. The *Addington* court emphasized that the questions at issue differed substantially from those "straightforward factual question[s]" at the heart of delinquency proceedings and criminal prosecutions. *Id.* at 429, 99 S.Ct. 1804.

### 2. The Evidentiary Standard Due Process Requires for Proceedings Under Section 4248

Based on an analysis of *Winship* and *Addington*, I conclude that due process requires the court to apply the reasonable doubt standard to the backward-looking factual finding required for commitment as a sexually dangerous person. *Accord Comstock*, 2007 WL 2588815, at *27. Whether a person has "engaged or at-

tempted to engage in sexually violent conduct or child molestation," 18 U.S.C. § 4247(a)(5), is precisely the type of "straightforward factual question" that prompted the Court to require a "reasonable doubt" standard in *Winship*. *Addington*, 441 U.S. at 429, 99 S.Ct. 1804; *see Winship*, 397 U.S. at 368, 90 S.Ct. 1068. However, I find that, under *Addington*, a "clear and convincing" standard for the forward-looking determination as to whether a person is "sexually dangerous to others" is constitutionally sufficient. 18 U.S.C. § 4247(a)(6).

Contrary to the government's assertion, *Addington* does not establish that the "clear and convincing" standard is the constitutional minimum for the court's retrospective determination of whether the person "has engaged or attempted to engage in sexually violent conduct or child molestation." 18 U.S.C. § 4247(a)(5); *see also Washington v. Rinaldo*, 98 Wash.2d 419, 655 P.2d 1141, 1145 (1982) (noting, in a post-*Addington* decision, that the "analogy to *Winship* is clear and persuasive," and holding that, in absence of statutory direction, " 'beyond a reasonable doubt' is the proper standard of proof to be employed in the initial sexual psychopathy commitment proceeding.") Unlike most state sexual offender statutes, Section 4248 does not require a prior conviction or criminal charge of a sexually violent crime before a person can be committed as sexually dangerous. *See Comstock*, 2007 WL 2588815, at *27 n. 25 (surveying evidentiary standards used in state sexually violent predator statutes); *Hendricks*, 521 U.S. at 352, 117 S.Ct. 2072 (involving a Kansas statute where the state committed only

---

**4.** The determinations required for commitment under the Texas statute were: "(1) whether the proposed patient is mentally ill, and if so (2) whether he requires hospitalization in a mental hospital for his own welfare

and protection or the protection of others, and if so (3) whether he is mentally incompetent." *Addington*, 441 U.S. at 420, 99 S.Ct. 1804 (quoting Tex.Rev.Civ. Stat. Ann. art. 5547–51 (Vernon 1958)).

those charged or convicted of a sexually violent offense).

An individual's liberty interest in a civil commitment proceeding is of considerable weight and gravity, as he faces potentially indefinite involuntary commitment. *See Addington,* 441 U.S. at 427, 99 S.Ct. 1804. It is hard to imagine a worse stigma than being labeled a sexual predator, especially one who preys on children. Although the government has an interest in committing those who are truly sexually dangerous, requiring the application of the reasonable doubt standard to the initial factual finding under Section 4248 will minimize the risk that an individual will be erroneously deprived of liberty.

■■■ For the foregoing reasons, Section 4248's failure to require a finding of proof beyond a reasonable doubt that a person has engaged or attempted to engage in sexually violent conduct or child molestation prior to allowing that person's potentially indefinite commitment as a sexually dangerous person constitutes a violation of due process.

On the other hand, the Supreme Court's decision in *Addington* establishes that Section 4248's standard of "clear and convincing evidence" for a court's second, forward-looking, determination that a person is "sexually dangerous to others" passes constitutional muster.

### 3. *The Proper Remedy*

■■■ A finding of a constitutional flaw on the face of a statute does not require a wholesale invalidation of the statute. As the Supreme Court explained in *Ayotte v. Planned Parenthood of Northern New England:*

> [W]hen confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact.

546 U.S. 320, 323, 328–29, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) (holding that invalidating a statute is "not always necessary or justified, for lower courts may be able to render narrower declaratory and injunctive relief") (citations omitted). Lower courts should opt for a modest remedy "[s]o long as they are faithful to legislative intent." *Id.* at 331, 126 S.Ct. 961; *see also id.* at 330, 126 S.Ct. 961 ("After finding an application or portion of a statute unconstitutional, we must next ask: Would the legislature have preferred what is left of its statute to no statute at all?"); *United States v. Booker,* 543 U.S. 220, 246, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) ("We answer the remedial question by looking to legislative intent.... We seek to determine what 'Congress would have intended' in light of the Court's constitutional holding.") (citations omitted).

A modest remedy is appropriate here. The constitutional problem is the Act's failure to require a finding of proof beyond a reasonable doubt that a person has engaged or attempted to engage in sexually violent conduct or child molestation. Accordingly, I hold that any application of the Act to an individual without a finding beyond a reasonable doubt of sexually violent conduct or child molestation is unconstitutional. The government can meet its burden by demonstrating that the person has been previously convicted of a relevant sex crime.

The same result can also be reached by severing the phrase "by clear and convincing evidence" from Section 4248(d). The statute would remain fully operative as law, for the court conducting the commitment proceeding would apply the constitutionally required standard of proof to each

finding. *See Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 684, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987) ("[T]he invalid part [of a statute] may be dropped if what is left is fully operative as a law."). The government concedes that severance of the evidentiary standard from the statute is a viable remedy, and preferable to the wholesale invalidation of the statute.

Regardless of the way that the remedy is framed, there can be little doubt that Congress would prefer limiting the application of Section 4248 to those proven guilty of the offending conduct beyond a reasonable doubt than having no statute at all. Even so limited, the Act fulfills Congress's purpose of ensuring that persons who are sexually dangerous are not released from federal custody.

## C. *Section 4248's Failure to Provide for a Probable Cause Determination*

■ Respondents allege that the Act's failure to provide for a judicial probable cause determination before, or within a reasonable period of time after, the deprivation of liberty violates the Fourth and Fifth Amendments. Respondents argue that both the initial certification of respondents and their continued detention beyond their scheduled dates of release constitute deprivations of liberty. Only the latter deprivation described by respondents—the continued detention of an individual beyond his scheduled release date—is relevant to this particular due process inquiry.

### 1. *Fourth Amendment*

■ It is well-settled that the Fourth Amendment protection against unreasonable seizures applies to the involuntary hospitalization of persons for psychiatric reasons. *Ahern v. O'Donnell,* 109 F.3d 809, 815–16 (1st Cir.1997) (holding that probable cause was required to seize

an individual for involuntary hospitalization pursuant to state statute); *Villanova v. Abrams,* 972 F.2d 792, 795 (7th Cir.1992) ("A civil commitment is a seizure, and may be made only upon probable cause."). Where the stakes are high, the Supreme Court has determined that "the detached judgment of a neutral magistrate is essential." *Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) ("[A] judicial determination of probable cause [is] a prerequisite to extended restraint of liberty following arrest."); *see also Brady v. Dill,* 187 F.3d 104, 111 n. 6 (1st Cir.1999) (explaining that the principle of separating executive and judicial functions was central to the *Gerstein* Court's insistence that a warrantless arrest requires a judicial confirmation of probable cause). Absent an emergency or extraordinary circumstances, the probable cause determination should occur within forty-eight hours of detention. *County of Riverside v. McLaughlin,* 500 U.S. 44, 56–57, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) (holding that a judicial determination of probable cause within forty-eight hours of arrest is presumed to satisfy the Fourth Amendment, but that after forty-eight hours, the burden shifts to the government to demonstrate that an emergency or extraordinary circumstance justifies the delay).

The failure of the Act to mandate a probable cause hearing raises serious constitutional concerns under the Fourth Amendment. An individual certified under Section 4248 is subject to detention based solely on the submission of a certificate by the Attorney General, the Director of the BOP, or their designee. The Act does not establish an evidentiary standard for the certificate, although the *proposed* regulations allow certification only whenever there is "reasonable cause" to believe an individual is "sexually dangerous." *See* Civil Commitment of a Sexually Danger-

ous Person, 72 Fed.Reg. 43205–01 (proposed Aug. 3, 2007) (to be codified at 28 C.F.R. pt. 549), § 549.70. Prior to the full-blown commitment proceeding which can be seventy-five days (or more) after certification, the statutory language does not provide for *any* approval by a neutral decisionmaker. The certificate can be issued up until the moment that an individual is released from federal custody and the certificate automatically stays that person's release. Indeed, the three respondents were all certified on the eve of their release from federal prison. There is no evidence in this record that any of the detainees under the Act has had a probable cause determination before a neutral decisionmaker.[5] It is therefore likely that, under the Act, a person will be detained for several months without any kind of probable cause determination. The proposed regulations do nothing to address this clear deficiency. They neither establish deadlines for certification nor provide for a probable cause hearing.

I therefore conclude that the Act's failure to explicitly mandate any sort of probable cause determination and hearing before or within a reasonable time after a person is detained beyond his scheduled release date raises serious constitutional questions with respect to well-established Fourth Amendment protections.

### 2. *Fifth Amendment*

▮▮▮▮ The Supreme Court has held that individuals facing involuntary commitment, including those already serving a prison sentence, are entitled to due process protections. *Vitek v. Jones*, 445 U.S. 480, 491–94, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (holding that the involuntary transfer of a prisoner to a mental hospital implicates a liberty interest and triggers due

process protections of the Fourteenth Amendment); *Addington*, 441 U.S. at 425, 99 S.Ct. 1804 ("This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."); *United States v. Sahhar*, 917 F.2d 1197, 1206 (9th Cir.1990) (analyzing a Fifth Amendment due process challenge to Section 4246, a federal civil commitment statute). Unlike the forty-eight hour timetable for a probable cause determination under the Fourth Amendment, there is no established time limitation for detentions challenged under the Due Process Clause. *See Villanova*, 972 F.2d at 797. Instead, to identify "the specific dictates of due process," a court must weigh three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 334–35, 96 S.Ct. 893 (citing *Goldberg v. Kelly*, 397 U.S. 254, 263–271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)).

Under the first *Mathews* factor, the individual's private interest in avoiding involuntary confinement is substantial. As discussed above, an individual certified under the Act faces potentially indefinite involuntary commitment as well as the significant stigma of being labeled a sexual predator. This stigma is particularly strong for those labeled as preying on children.

5. The three respondents in the instant litigation have recently waived the right to a probable cause hearing, but this does not affect the constitutional challenge before this Court.

Second, the risk of erroneous deprivation of liberty is high, for an individual certified under Section 4248 is subject to immediate detention (or stay of release) based solely on the submission of a certificate by *one* person. *See* 18 U.S.C. § 4248(a) (providing that the Attorney General, the Director of the BOP, or their designee may certify an individual as a "sexually dangerous person"). This one person need not be a psychiatrist or mental health professional. *Cf. Doe v. Gallinot,* 657 F.2d 1017, 1019 n. 3, 1024 (holding that due process required a probable cause hearing in front of a neutral decisionmaker to be held before a person could be civilly committed even though commitment under the statute could only occur with the approval of a physician or psychologist). Moreover, the person committed may not ever have been convicted of a sex crime. *Cf. Sarzen v. Gaughan,* 489 F.2d 1076, 1083–86 (1st Cir.1973) (stating that a sex crime conviction provided sufficient cause for Massachusetts to commit a prisoner, without a hearing, for psychiatric observation within the term of his sentence, so long as other due process protections including notice, opportunities to object, and assistance of counsel were provided).

Furthermore, the statute does not provide for preliminary review of this certification by any neutral decisionmaker. In fact, the Act contains no procedure whereby a certified individual may challenge the appropriateness of the certification prior to the full-blown commitment proceeding. *Cf. Sarzen,* 489 F.2d at 1084–85 (holding that due process requires, prior to a sixty-day observational commitment, an opportunity for the inmate to review and object to the record which psychiatrists use in evaluating whether he is sexually dangerous).

The Act even fails to establish a clear deadline for when this ultimate commitment hearing must be held. Section 4247(b) allows the district court to order examination of the certified individual for up to forty-five days, with the possibility of a thirty day extension. While it is possible that Congress intended for the judicial hearing to occur within this seventy-five day period, the Act does not contain any explicit statutory provisions to that effect. Thus, under the Act as written, an erroneous certification will not be addressed for several months. A probable cause determination by a neutral decisionmaker would reduce the risk of error.

■ Finally, requiring a probable cause hearing need not substantially burden the government either financially or administratively. This Court recognizes that a pre-deprivation hearing may not always be feasible. Due process, however, requires only that a person certified under the Act be given an opportunity for a post-deprivation hearing before a neutral decisionmaker within a reasonable period of time following any detention beyond his scheduled release date.

Courts have varied widely in their evaluations of the constitutionality of the time periods afforded under state civil commitment statutes. *See, e.g., Project Release v. Prevost,* 722 F.2d 960, 974–75 (2d Cir.1983) (sixty days); *Gallinot,* 657 F.2d at 1025 (9th Cir.1981) (seven days); *Donahue v. R.I. Dept. of Mental Health, Retardation and Hosps.,* 632 F.Supp. 1456, 1471 (D.R.I. 1986) (Selya, J.) (ten days as the "outermost periphery of what is permissible"); *Coll v. Hyland,* 411 F.Supp. 905, 910–11 (D.N.J.1976) (twenty days); *Doremus v. Farrell,* 407 F.Supp. 509, 515 (D.Neb.1975) (five days for initial probable cause hearing and fourteen days for formal hearing).

The government wisely does not deny that individuals certified under Section 4248 are entitled to due process protections. Instead, the government argues

that any facial challenge based on the Act's failure to require a probable cause determination must fail under the "no set of circumstances" standard set forth in *U.S. v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). Because there is nothing in the statute that prevents the government from providing a certified individual with a probable cause determination in the appropriate period of time, the government contends that it is possible for the statute to be constitutionally applied. This, it maintains, is enough to satisfy the stringent *Salerno* standard.

As a threshold matter, the continuing vitality of the *Salerno* standard is unclear. In *City of Chicago v. Morales*, 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999), a plurality of the Court explained: "To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision in this Court, including *Salerno* itself." The plurality considered the notion that it would "be appropriate for federal courts to apply the *Salerno* standard in some cases" to be "a proposition which is doubtful." *Id.; see also Washington v. Glucksberg*, 521 U.S. 702, 740, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (Stevens, J., concurring) ("I do not believe the Court has ever actually applied such a strict standard [as no-set-of-circumstances], even in *Salerno* itself, and the Court does not appear to apply *Salerno* here."); *Janklow v. Planned Parenthood, Sioux Falls Clin-*

*ic*, 517 U.S. 1174, 1175, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996) (mem. of Stevens, J., respecting the denial of the petition for a writ of certiorari) ("*Salerno's* rigid and unwise dictum has been properly ignored in subsequent cases even outside the abortion context"); *Planned Parenthood of N. New England v. Heed*, 390 F.3d 53, 58 (1st Cir.2004) (explicitly abandoning *Salerno* in the abortion context), *vacated and remanded on other grounds sub nom., Ayotte*, 546 U.S. 320, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006); *McGuire v. Reilly*, 386 F.3d 45, 57 (1st Cir.2004) (acknowledging the possibility that *Salerno* does not apply to a vagueness challenge). *But see Morales*, 527 U.S. at 81, 119 S.Ct. 1849 (criticizing the Court for creating "entirely irrational exceptions to the 'unconstitutional in every conceivable application' rule") (Scalia, J., dissenting).

Still, the First Circuit has upheld the *Salerno* standard in some recent constitutional cases. *See Comfort v. Lynn School Committee*, 418 F.3d 1, 12 (1st Cir.2005) (articulating the *Salerno* standard in equal protection context but also finding that party lacked standing), *abrogated on other grounds, Parents Involved in Comty. Sch. v. Seattle Sch. Dist.,* — U.S. —, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007); *McGuire*, 386 F.3d at 58 (holding that state statute was not facially unconstitutional on grounds of impermissible viewpoint discrimination). This Court, however, is not aware of a First Circuit opinion applying *Salerno* to a Fourth Amendment seizure challenge.[6]

Even assuming *Salerno* still has legs, the government's argument still fails because the "no set of circumstances" test is

---

**6.** District courts in Massachusetts have rejected *Salerno* as dicta and declined to apply it to an Eighth Amendment challenge, *United States v. Sampson*, 275 F.Supp.2d 49, 82–83 (D.Mass.2003) (Wolf, J.), and to a Sixth Amendment challenge involving the federal sentencing guidelines, *United States v. Mueffelman*, 327 F.Supp.2d 79, 95 n. 37 (D.Mass. 2004) (Gertner, J.).

inapposite here. In *Salerno*, the Court applied the test and upheld the Bail Reform Act against a due process challenge because the statute, on its face, contained procedures "adequate to authorize the pretrial detention of at least some [persons] charged with crimes." *Id.* at 751, 107 S.Ct. 2095 (internal quotation marks omitted). Under the statute challenged in *Salerno*, an "arrestee is entitled to a prompt detention hearing" and "[i]n a full-blown adversary hearing, the Government must convince a neutral decisionmaker by clear and convincing evidence" that pretrial detention is warranted. *Id.* at 747, 750, 107 S.Ct. 2095. Section 4248, in contrast, provides no such safeguards on its face. Rather, because neither the Act's language nor the proposed regulations provide for a timely probable cause determination before a neutral decisionmaker, the procedures established by the Act itself, unlike the procedures of the Bail Reform Act in *Salerno*, will *never* be adequate to authorize the detention of *any* individuals certified under Section 4248.

There is a critical difference between a challenge to a statute, which although it provides proper procedural safeguards, is applied unconstitutionally to a particular individual, and a statute which simply omits safeguards which are clearly required by the Constitution. While the "no set of circumstances" test arguably bars a facial challenge in the former situation, it cannot be interpreted as barring a facial challenge in the latter. That the statute does not explicitly prohibit the government from providing constitutionally required procedures cannot on its own, as the government contends, protect the Act from a facial challenge. As such, because this statutory scheme permits deprivation of liberty without a timely probable cause determination by a neutral decisionmaker, *Salerno* does not cause this facial challenge to fail because the statute, on its face, endorses procedures that clearly do not comport with the Fourth Amendment or Due Process Clause.

### 3. *The Doctrine of Constitutional Avoidance*

 A court should interpret a statute to avoid a serious constitutional flaw unless such a saving construction plainly contradicts the clear intent of Congress. *See Zadvydas v. Davis*, 533 U.S. 678, 689, 696–97, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). In *Zadvydas*, the Court saved a federal immigration statute from wholesale invalidation by construing it as containing an "implicit 'reasonable time' limitation." *Id.* at 682, 697, 121 S.Ct. 2491 (concluding that "indefinite detention of aliens ... would raise serious constitutional concerns" and finding that there was no clear congressional intent to authorize such indefinite detention). The Court went even further and designated six months as the presumptively reasonable period for detention. *Id.* at 701, 121 S.Ct. 2491.

A statute failing to provide an individual with an opportunity for a probable cause hearing before a neutral decisionmaker within a reasonable period of time following any detention resulting from the stay of release at the end of his prison sentence (except in exigent or extraordinary circumstances) would raise a serious constitutional problem under both the Fourth and Fifth Amendments.

The government concedes that, to avoid constitutional doubts, this Court has the authority to interpret the Act to require a probable cause hearing within a specified time period. Accordingly, I construe the Act to contain an implicit requirement that an opportunity for a probable cause hearing before a neutral decisionmaker be afforded within a reasonable period of time after any detention resulting from the stay

of release at the end of his prison sentence. The parties have not fully briefed the procedures necessary to meet the requirements of the Due Process Clause and the Justice Department has not proposed regulations on point. The logistics may be complicated, but the Due Process Clause is flexible. Until a reasonable alternative is proposed, except in exigent or extraordinary circumstances, a hearing should occur within forty-eight hours after a certified individual is detained beyond his scheduled release date. *See McLaughlin,* 500 U.S. at 56–57, 111 S.Ct. 1661; *Gerstein,* 420 U.S. at 114, 95 S.Ct. 854.

### D. *Civil or Criminal*

■ Respondents argue that the commitment procedures established by Section 4248 constitute a criminal proceeding that fails to provide the protections offered criminal defendants by the Constitution. The government insists that the Act is a non-punitive civil measure not subject to criminal protections.

The Supreme Court has held that civil commitment proceedings for sexually dangerous persons are not criminal. *See, e.g., Hendricks,* 521 U.S. at 369, 117 S.Ct. 2072 (holding that the Kansas Sexually Violent Predator Act ("KSVPA") did not establish criminal proceedings and that involuntary confinement pursuant to the Kansas statute was not punitive); *Allen v. Illinois,* 478 U.S. 364, 374, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986) (concluding that "proceedings under the [Illinois Sexually Dangerous Persons] Act are not 'criminal' within the meaning of the Fifth Amendment's guarantee against compulsory self-incrimination"). In *Hendricks,* the Court began its inquiry by noting that the "categorization of a particular proceeding as civil or criminal is 'first of all a question of statutory construction'" and emphasizing that the Court will "ordinarily defer to the

legislature's stated intent." *Id.* at 361, 117 S.Ct. 2072 (quoting *Allen,* 478 U.S. at 368, 106 S.Ct. 2988). While a "civil label is not always dispositive," the *Hendricks* Court explained that it will only reject the legislature's stated intent when the challenging party provides "'the clearest proof' that 'the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention.'" 521 U.S. at 361, 117 S.Ct. 2072 (alteration in original) (quoting *United States v. Ward,* 448 U.S. 242, 248–49, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)).

Congress included the phrase "civil commitment" in the title of Section 4248. *See* 18 U.S.C. § 4248 ("Civil commitment of a sexually dangerous person"). However, Congress codified the Act within the criminal code, at 18 U.S.C. § 4248. Respondents argue that this placement indicates congressional intent to create a criminal scheme. This argument is unconvincing, however, because the particular chapter in which the scheme was codified includes other federal commitment provisions that federal courts have deemed civil in nature. *See, e.g., United States v. Phelps,* 955 F.2d 1258, 1262 (9th Cir.1992) (finding that district court did not err in determining that 18 U.S.C. § 4243(f) is "civil" in nature); *Sahhar,* 917 F.2d at 1205–06 (9th Cir.1990) (finding that commitment under section 4246 "serves a regulatory, rather than punitive, purpose" and thus does not need to incorporate the right to a jury trial). Congress's placement of the provisions does not indicate an intent that the proceedings be deemed "criminal."

Respondents cannot satisfy the "heavy burden" of showing, by "the clearest proof," that the Act is "so punitive either in purpose or effect as to negate" the legislature's expressed intent that the proceedings be "civil." *Hendricks,* 521 U.S. at 361, 117 S.Ct. 2072. In *Hendricks,* the Court emphasized that the Kansas scheme

"does not implicate either of the two primary objectives of criminal punishment: retribution or deterrence"; that the restriction of freedom of "the dangerously mentally ill" is a "legitimate nonpunitive governmental objective"; that the Kansas statute's provisions indicated that Kansas "does not intend an individual committed pursuant to the Act to remain confined any longer than he suffers from a mental abnormality rendering him unable to control his dangerousness"; that the State's decision to provide some safeguards required in criminal trials "cannot itself turn these [commitment] proceedings into criminal prosecutions"; and that the Constitution does not prevent a "State from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others." *Id.* at 361–369, 117 S.Ct. 2072.

Because Section 4248 has the same basic characteristics that convinced the Court in *Hendricks* that the proceeding was civil, I conclude that Section 4248 establishes a scheme of civil, not criminal, commitment for sexually dangerous persons. Respondents' ex post facto, grand jury, self-incrimination, Sixth Amendment jury trial, and cruel and unusual punishment claims are only cognizable in the criminal or punitive context. Because Section 4248 is properly construed as a civil scheme, these challenges must be rejected.

### E. *Right to a Jury Trial*

█ Respondents contend that due process requires a jury trial in commitment proceedings conducted under the Act. The Supreme Court has not squarely addressed the question of whether a jury is required in a civil commitment proceeding. *See Poole v. Goodno,* 335 F.3d 705, 709–11 (8th Cir.2003) ("There is no clearly established Supreme Court law which holds that due process requires a jury trial

in civil commitment proceedings or that incorporates the Seventh Amendment right to a jury for such cases.").

Several courts, however, have concluded that due process does not provide a constitutional right to a trial by jury in a civil commitment proceeding. *See, e.g., Sahhar,* 917 F.2d at 1206–07 (rejecting Fifth Amendment due process and Sixth Amendment trial by jury claims to a federal statute authorizing civil commitment of criminal defendants found incompetent to stand trial); *Doremus,* 407 F.Supp. at 516 (holding that a jury trial is not constitutionally required to afford due process in a state civil commitment proceeding); *cf. McKeiver v. Pennsylvania,* 403 U.S. 528, 543–45, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (holding that, despite shortcomings in existing procedures, a jury trial was not constitutionally required in a juvenile court's adjudicative stage); *Perry,* 788 F.2d at 117 (holding that the Seventh Amendment guarantee of jury trial in civil cases did not apply because "a proceeding leading to civil preventive detention, whatever else it is, plainly is not a suit at common law").

Although an advisory jury may be desirable in a civil commitment proceeding under the Act where there is no prior conviction for a sex offense, a jury trial is not constitutionally required by the Due Process Clause. It is worth pointing out, however, that the parties have jointly requested that the Court may empanel an advisory jury. *See* Fed.R.Civ.P. 39(c). I have allowed that motion.

### F. *Adequate Notice*

█ Respondents allege that the Act denies them due process of law because it fails to require adequately detailed notice of the proposed basis for commitment. An "'elementary and fundamental requirement of due process in any pro-

ceeding which is to be accorded finality is *notice reasonably calculated, under all the circumstances,* to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *LeBeau v. Spirito,* 703 F.2d 639, 644 (1st Cir.1983) (emphasis in original) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314–15, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). Due process requires that notice "be given sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded, and it must set forth the alleged misconduct with particularity." *Application of Gault,* 387 U.S. 1, 33, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (holding that, in a juvenile proceeding, due process required, *inter alia,* constitutionally adequate notice of charges) (internal quotation marks omitted). The certificates issued to the respondents state only that the individual has been certified based on a review of his records. They do not identify the underlying instances of misconduct upon which the certification was made. The certificates, in their current form, fail to set forth the alleged misconduct with particularity and therefore are constitutionally insufficient. This shortfall, however, can easily be addressed on a case-by-case basis and does not form the basis for a facial challenge.

## G. *Vagueness*

■ Respondents assert that the Act fails to adequately define 41 key terms and is therefore unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment. Respondents also maintain that the Act delegates legislative responsibility in derogation of Article I, Section 1 of the Constitution. *See* U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."). Although the void-for-

vagueness doctrine is technically distinct from the excessive delegation doctrine, the facts overlap in this inquiry.

■ A "vagueness inquiry ... incorporates two basic concerns: 1) concerns about fair notice, and ... 2) concerns about excessive discretion being invested in administering and enforcing officials." *Ridley v. Mass. Bay Transp. Auth.,* 390 F.3d 65, 93 (1st Cir.2004). Fair notice is deemed essential because "[v]ague laws may trap the innocent." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). A statute or regulation, however, is not vague simply because it requires interpretation. *Ridley,* 390 F.3d at 93. Under the "fair notice" prong, a statute must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Id.* The Act's terms satisfy this minimal notice requirement. *See United States v. Carta,* 503 F.Supp.2d at 410 ("Terms such as 'child molestation' and 'sexually violent conduct' have a plain meaning and are not 'so vague and standardless that it leaves the public uncertain.'") (citations omitted).

■ The second part of the vagueness inquiry stems from the recognition that "[a] vague law impermissibly delegates basic policy matters to police[ ], judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned,* 408 U.S. at 108–09, 92 S.Ct. 2294. To pass constitutional muster under this prong, a statute must "provide explicit standards for those who apply them." *Id.* at 108, 92 S.Ct. 2294.

Respondents argue that the Act fails to meet this constitutional standard because it does not define certain terms, including "serious mental illness," "serious difficulty," "sexually violent conduct," and "child molestation." These terms provide sufficiently explicit standards to defeat a

vagueness challenge. *See Peterson v. Gaughan*, 404 F.2d 1375, 1377 (1st Cir. 1968) (rejecting vagueness challenge to Massachusetts sexually dangerous person commitment statute which included terms such as "misconduct in sexual matters" and "general lack of power to control his sexual impulses"). This Act is not void for vagueness.

## H. *Equal Protection*

 Respondents allege that the Act violates the Equal Protection Clause in two different ways. First, respondents assert that the Act impermissibly singles out all federal prisoners as eligible for certification and commitment as sexually dangerous persons. Second, respondents maintain that the Act arbitrarily discriminates among purportedly "dangerous" mentally ill federal prisoners.

 "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (internal quotation marks omitted). Although the Fifth Amendment does not contain an equal protection clause, a classification that would be invalid under the Fourteenth Amendment would also violate the due process requirement of the Fifth Amendment. *See Johnson v. Robison*, 415 U.S. 361, 366 n. 4, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974). A court generally employs "rational basis" review to determine whether a statute passes constitutional muster under the Equal Protection Clause. *See City of Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249. A statute that implicates a fundamental right or a suspect class (e.g., race or national origin), however, triggers the more demanding "strict

scrutiny" test and will be sustained only if it is narrowly tailored to serve a compelling government interest. *Id.* The Supreme Court has not squarely addressed the appropriate level of scrutiny to apply to civil commitment statutes. *Hubbart v. Knapp*, 379 F.3d 773, 781 (9th Cir.2004), *cert. denied*, 543 U.S. 1071, 125 S.Ct. 913, 160 L.Ed.2d 807 (2005).

Relying on a plurality opinion in *Foucha v. Louisiana*, 504 U.S. 71, 85–6, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992), respondents contend that strict scrutiny is required because the Act implicates the "fundamental right" of "freedom from physical restraint." *Id.* However, courts have declined to interpret *Foucha* as requiring heightened review of civil commitment statutes. *See United States v. Weed*, 389 F.3d 1060, 1071 (10th Cir.2004) (concluding that a federal statute governing commitment of insanity acquittees implicated neither a fundamental right nor a suspect class and applying rational basis review); *Carta*, 503 F.Supp.2d at 408 (rejecting argument that *Foucha* mandates application of strict scrutiny to any unequal classifications that restrict liberty and applying rational basis review to Section 4248); *Westerheide v. State*, 831 So.2d 93, 111–12 (Fla. 2002) (applying rational basis review to a state sexual predator commitment statute after concluding that the committee's strict scrutiny argument "mischaracterizes the nature of [the] equal protection claim").

Respondents assert that the Act impermissibly subjects all federal prisoners— and no one else—to possible lifetime commitment in the absence of any rational nexus between federal prisoners and the governmental purpose of incapacitating sexually dangerous persons. Respondents' argument is difficult to decipher, but they do not appear to contend that the government can never subject prisoners to civil commitment procedures without also sub-

jecting those outside of custody to the same procedures. To the extent, however, that is their argument, it must fail because sexually dangerous persons in the custody of the federal government are not similarly situated to sexually dangerous persons not charged with a federal crime or serving a federal sentence. *See Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (" '[T]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.' ") (quoting *Tigner v. Texas,* 310 U.S. 141, 147, 60 S.Ct. 879, 84 L.Ed. 1124 (1940)); *Peterson,* 404 F.2d at 1377–78 (rejecting similar argument by appellant challenging Massachusetts sexually dangerous person statute and noting that problems with invasion of privacy and individual liberties would preclude legislative attempts to subject those not in custody to such proceedings).

■ Emphasizing that the federal prison population contains relatively few sexually violent offenders and child molesters, respondents insist that the Act is unconstitutional because there is no rational reason for the government to single out those in federal custody for civil commitment under the Act. The inquiry for such a claim, however, is identical to the inquiry which this Court undertook in reaching the conclusion that the Act was a "necessary and proper" exercise of congressional power. *See supra* Part III.A.2.

■ Respondents also allege that the Act impermissibly imposes unequal burdens on the sexually dangerous as compared to those already subject to confinement for dangerousness under Section 4246. *See* 18 U.S.C. § 4246 ("Hospitalization of a person due for release but suffering from mental disease or defect"). Specifically, they stress that Section 4246's prior hospitalization requirement provides an additional layer of safeguards—including, upon objection by the prisoner, a pre-

hospitalization hearing before the court—that are not available under Section 4248. There is no rational basis, respondents contend, for there to be fewer procedural safeguards afforded to those subject to commitment under Section 4248, as compared to those subject to commitment under Section 4246. This claim must fail, however, because Congress may rationally conclude that a person who has already committed a sexually violent act is dangerous even if there is no prior hospitalization or treatment. Indeed, if a prisoner has been incarcerated for a non-sex crime, he is likely in an institution where no treatment is available.

Accordingly, I reject both of respondents' equal protection claims.

## I. *Daubert*

Respondents assert that the psychiatric or psychological evidence that is required for commitment under the Act is deficient under the evidentiary standard established by *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

They have submitted an affidavit from Dr. Daniel Kriegman, a licensed psychologist, who concludes that available tools for predicting sexual dangerousness make it impossible for psychological testimony to establish, by clear and convincing evidence, that an individual is sexually dangerous within the meaning of the statute. The government has countered with federal and state authority approving the use of expert psychiatric testimony on the issue of an offender's sexual dangerousness, but has not submitted an expert affidavit to rebut Dr. Kriegman's assertions. A determination on this issue must await a *Daubert* hearing.

## IV. *ORDER*

Respondents' motion to dismiss the proceedings is *DENIED.*